Thank you, Governor. If I could reserve a couple of minutes for rebuttal. There are multiple reasons this Court should reverse Mr. Stanard's possession convictions. I would like to start first with the fact that the evidence used against him at trial was the result of an unlawful search of his home. Searching a home without a warrant was per se unreasonable, and the government bears the burden of proving that an exception to the warrant requirement exists. Here, the government relies on Mr. Stanard's wife's consent to allow the deputies into her home. But as this Court reiterated in United States v. Reed, the sanctity of the home is so elevated that the government can only demonstrate voluntary consent where it shows that consent was unequivocal and specific, freely and intelligently given, and that there was not even the implication of coercion by the deputies. Demonstrating that Ms. Stanard simply acquiesced to the deputies' request does not satisfy the government's heavy burden. At the suppression hearing, the deputy testified that he believed Ms. Stanard wanted his assistance, that she wanted to show him the firearms in the home and have him remove them for safekeeping. But the deputy acknowledged that this was not what Ms. Stanard actually said to him. When the deputy was questioned on the stand about whether Ms. Stanard wanted him to remove the firearms for safekeeping, his response was, quote, she never told me not to. This statement is really illustrative of the tenor of the interaction that took place between the deputy and Ms. Stanard. It's undisputed that Ms. Stanard was emotional, that she was speaking to the deputies, that she was crying, and that she appeared fearful. But the deputy understood, according to his testimony, that she was afraid of her husband. But Ms. Stanard testified that she was overwhelmed by the situation and concerned about her husband. I mean, the district judge heard all of this, he viewed this testimony, and then he concluded that she did give consent. And from this record, it certainly looks like a reasonable person. And she wasn't under arrest, she was the victim, she wasn't in custody. Why would we conclude, in light of his ruling, that she didn't consent? Well, based on the evidence presented at the hearing, this court used the denial of this oppression motion de novo. And the testimony that was put forth, the trial court discussed the fact that it was largely the deputy's testimony and Ms. Stanard's testimony. It was similar in many ways. Where it diverged was as to their perception of what the deputy believed Ms. Stanard wanted versus what she testified she actually felt. In looking at this according to the brutality of the circumstances, Ms. Stanard just watched these deputies exhibit a fairly extraordinary show of force against Mr. Stanard. He had come out and was very upset. She watched the deputies draw their firearms against him. Was there any force displayed against Anna in this case? Against her directly when they came to the door? They did not have their firearms drawn, no. Why would the display of force with respect to Robert have given her any concern or any reasonable person in that situation concern that force would be used against them? It seems illogical that force would be used against the victim after the perpetrator is taken away. Well, Ms. Stanard expressed that she was fair-handed. I would submit to the court that it is reasonable and logical to assume that after having watched these deputies exhibit force when Mr. Stanard was not compliant. No, no, no. But here we have some factual findings that the district court made. And he said she was never seen as the victim. She was never threatened. She was never threatened with arrest. She was never handcuffed. So why aren't we bound by those findings? Never had guns pointed at her. And there were not. And again, I think what's important here is that Ms. Stanard is expressing her concern and obviously that concern has to be reasonable. But even if, I guess my point is that those two things do not have to be mutually exclusive. So the deputy may have honestly believed all of those things, but Ms. Stanard did not. And he never told her otherwise. And that is the difficulty here. The deputy may have not. His perception of the situation, he never got that specific and unequivocal consent from her that would have made it voluntary. He never told her, you have the right to refuse. I do not have to come into your home. If I'm asking to do this, you can tell me no. He never told her otherwise. And her testimony was specifically that she felt she had no choice but to answer his questions. She could not refuse to cooperate with him and she could not decline to answer anything he was asking of her. Let me ask you a question. Did the agent or Deputy Navarro testify that he believed that she was a victim and in his mind she was a victim and he was treating her as a victim as opposed to somebody that might be a suspect?  He may have viewed her that way, but he also, I think the difference is he also acknowledged during his testimony that he knew about the fact that there were firearms in the home because of the dispatcher. And that when she asked him, or excuse me, when Ms. Stickford told him about the pistol, his response was that he, quote, said, yes, I wanted to get into different areas. So he was looking for more information from her, from Ms. Standard. He wanted additional information from her and he wanted to get into the home to view that information. So whether he was also viewing her as a victim, he failed to tell her that she did not have to cooperate with him and that, in fact, he was very interested in seeing the firearms that were in the home. And I think that that's where the problem is, the fact that he did not he did not make this clear to her and that she felt very much that she had to cooperate and that that simply does not provide the necessary consent that was not unequivocal and specific. It was not free and voluntary. But as I read this, he didn't you know, he generally found her credible, but not he did not say that he found everything that she said to be credible. And he rejected the view that she did not want to be cooperative. He said the court finds that the evidence, in fact, overwhelmingly shows the opposite, that she was very cooperative with the police officers that night. We're bound by that factual finding, aren't we? Well, I guess I don't know that that Ms. Stannard was she was cooperative to the extent that she felt that she had to be cooperative. She she believed that she I mean, those were her own words that she felt like she had to cooperate with them. She certainly wasn't resisting. She was very much to their requests and their demands to show her show them around. And I think therein lies the problem. And particularly in the fact that when you look at the testimony from the suppression hearing that the deputy, the deputy isn't very direct about. He says he believes he wasn't the one who brought up the firearms first. But Ms. Stannard says that that he did. He doesn't say those things very definitively. He sort of hedges and he explains that he had this perception, again, going back to that idea when he's asked directly, did she say that she wanted you to take the firearms? His response is she did not tell me not to or she didn't tell me that she didn't want me to. So, again, going back to the idea that they never they never had the communication that was required to get her voluntary consent. And that's why we're asking for reversal as to the failure. But I, I was going to reserve some time, but I can move on briefly to talk about the Rehave issue. Just just quickly. I know that here here we're arguing that under Rehave, the indictment failed to allege Mr. Stannard had knowledge of his status as a felon. And the problem with that is is really well argued. All of the gatekeepers involved in his case did not understand. They were all operating under this false assumption that the government didn't know. Every decision he made about whether to go to trial, any decision he made pre-trial was based on this effective indictment. So we're asking for reversal. What's the standard of review we applied to the indictment review claim? We've acknowledged that it's plain error. But Mr. Stannard meets that standard. How does he meet the standard when he stipulated that he had been convicted of a crime punishable by imprisonment for more than a year? That was a stipulation, yes, to the fact that he had been convicted. It was not a stipulation as to his knowledge of his status. Well, but this isn't a case like Johnson where we need to go outside the trial record. I mean, there was evidence at the trial that he had his wife purchase the guns because he knew as a felon that he couldn't do that. So we actually have direct evidence in the record on that point. Right. And I think the problem with looking at the record and what evidence was introduced when Mr. Stannard was never put on notice that this was an element, this was a subjective mens rea element that the government was required to prove. So, counsel, if we reverse this, what do you want to have happen? You want to go back for another trial? Yes. And you will not stipulate to this at the next trial? The problem with... You want the government to put this in front of the jury and put in front of him how the prior convictions that he has and how long he spent in prison? Well, and obviously I'm not trial counsel and those decisions would have to be made at a later time. Right. But if you made that decision, we'd be right back here on an ineffective assistance of counsel claim. That's why these stipulations are routinely made, is to keep the government from putting this all over the courtroom. Yes, that is, of course, correct. But the problem is, is that when we are looking at the third and fourth prong of the plain error test, we are asking Mr. Stannard to basically... Medley referred to it as a counterfactual scenario to somehow understand what would have happened had the indictment against him been correct, not been defective. And we don't know what would have followed if he had had the protection of the grand jury he's entitled to, if he had had the correct... The charge against him was the one he was actually convicted of. Can I clarify one point, which is I thought the only thing that was being challenged here was the sufficiency of the indictment and not the sufficiency of the evidence at trial. Am I correct on that? Yes, that is correct. This is our challenge is to the effective indictment. Okay. You may want to save some time for rebuttal. Okay. All right. We will hear now from Ms. Miller. Good morning, Your Honors, and may it please the court. I'm Teal Miller for the United States. I'm going to begin with the suppression issue, and I think there are a couple of key points. One, at page 202 of the excerpts of record, the district court made a credibility finding. It found that Deputy Navarro's testimony was credible. That credibility finding means that you're on clear error review, and all the facts construed in favor of the fact finder's conclusions. It's up to the district to de novo whether those facts add up to the requisite consent, right? Of course, Your Honor. But to the extent there's any type of conflict here, the district court resolved it in favor of Deputy Navarro. I think there's another part of the district court's discussion of the evidence that's important, and it said Anna was in a difficult position here today, and what it was acknowledging or what it was referring to was the fact that she told the grand jury something slightly different than she told the court at the suppression hearing. And she acknowledges this on cross-examination at the suppression hearing. She acknowledges that she told the grand jury that she wanted to cooperate with Deputy Navarro because she was afraid of her husband. This is at pages 183 and 184 of the excerpts of record. I think that's the key fact here. On appeal and at the suppression hearing, she argues she cooperated simply because she felt that she had to. But the record makes clear that she cooperated because she was a victim of a domestic violence incident, and she was being treated as such. And she gave her consent non-verbally, and her testimony establishes this. She says, Navarro asked me where the guns were located. They both agreed they mutually understood there were firearms in the home before they started speaking on the basis of the 911 call. And that's at page 95 where Navarro says that. Was there a conflict in the testimony on who raised the subject of firearms first? Yes, there was. Did the district court resolve that finding? That conflict with the finding? No, it didn't because it didn't matter. It might have mattered if that was the only reason the deputy knew there were firearms. But here, he knew going in, and neither Navarro... Navarro said he believed she mentioned them first. She said he asked about them. But even if you assume he asked about them, her response was, I proceeded to tell him where they were located. That's at page 159 through 160 of the record. That's consent. Somebody says, are there guns in your home? And he says, she was escorting me around the house. That's consent. Consent doesn't have to be, yes, I consent to you searching my home. Consent can be, will you show me this? Yes, here it is. Or a physical verbal gesture showing you, leading you through the home. Those facts support the district court's conclusion. And this court should affirm the district court's decision to deny the suppression motion for those reasons. Turning to the Rehaif issue, I think the court's questions about the stipulation sort of point to, if you look at this question as what does the record show Mr. Stenard would have done if he had confronted a proper indictment, an indictment that alleged knowledge that he had been convicted of a crime that subjected him to punishment for more than a year, there's no question that this case would have turned out the same way. The indictment actually did refer to a felon in possession charge that he had been convicted of before. And the trial record, this is an easy case in that the trial record has that conviction, but it also, as you noted, has testimony from multiple witnesses that he was aware of his status as a prohibited person. I think even the Fourth Circuit applying Medley in this case would find that Mr. Stenard could not satisfy the Step 4 of plain error because of the clear and overwhelming evidence of his knowledge. So you think you would meet even the test in the Medley case? I think we would. I think that is a fact-specific analysis under Step 4. And the court has some language about sort of the special status of notice and the grand jury, but I think even in the Fourth Circuit, the court would have to acknowledge that when the indictment refers to both the facts that give him that status and the statute which alerts him to what he's being charged with, the grand jury's role has not been trampled on in any way that's significant. And there really isn't, given Judge Bybee's line of questions about prejudice, it's impossible to imagine a case in which we have all of these facts and the defendant says, well, I didn't want to stipulate my felony status before, but now I find for some reason it is advantageous to me for the jury to hear about this because now I know the government has to prove it. It's just the proof would have been overwhelming and would have made the case worse for him. And even the Fourth Circuit, I think, wouldn't overlook those facts. I'd be happy to address either of the other issues in the briefs if the court would like to discuss them. Otherwise, we'd ask that the judgment be affirmed. Thank you, Counselor. I think we still have some time left for rebuttal. Thank you, Your Honor. Just briefly, to address the argument that Ms. Stannard was seeking help because she was a victim of domestic violence. I'm sorry, I'm having trouble hearing you. Oh, I apologize. Can you hear me better now? Okay, that's better. Thank you. As to the comment that Ms. Stannard was a victim of domestic violence who wanted assistance that night, the record is clear that Ms. Stannard actually wanted help from a family member, not from the police. She did not ask the police to be called, and she was surprised that they were there. But didn't her father call the police? I believe her stepmother called the police, yes. Okay, and that was because the roommate who was living with them, she asked her to get some help, and she called her parents. But Ms. Stannard specifically wanted her parents' assistance. She did not ask that anyone contact law enforcement. So, she was not actually seeking that help from the authorities. I'm not sure. Why does that make a difference? Especially once the friend advised her parents in her parents' judgment, what she really needed was the police and not their assistance. Well, I think it's because it goes to Ms. Stannard's perception and what she wanted and whether or not she wanted the police in her home that night. And she did not, which is why we would ask the court to reverse. Thank you, counsel. The case just argued will be submitted.
judges: Bybee, Soto, Collins